UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
IMIG, INC., NATIONWIDE SALES AND SERVICES
INC., GUMWAND INC. and PERFECT PRODUCTS
SERVICE & SUPPLY INC.,

                              Plaintiffs,                          **MEMORANDUM
                                                                  AND ORDER**
                                                                  16-CV-6638 (ARL)
             -against-

OMI ELECTRIC APPLIANCE CO., LTD.,

                              Defendant.
------------------------------------------------------------------X
OMI ELECTRIC APPLIANCE CO., LTD. and BEIJING
CHINA BASE STARTRADE CO., LTD.,

                              Plaintiffs,

             -against-

IMIG, INC., NATIONWIDE SALES AND SERVICES
INC., GUMWAND INC., PERFECT PRODUCTS
SERVICE & SUPPLY INC., MARK GENOA and
SCOTT GENOA,

                              Defendants.
------------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

On February 5, 2016, the plaintiffs, Imig, Inc. ("Imig"), Nationwide Sales and Services

Inc. ("Nationwide"), Gumwand Inc. ("Gumwand") and Perfect Products Service & Supply Inc.

d/b/a Perfect Products, Inc. ("Perfect Products") (collectively, "Imig" or "the plaintiffs")[1]

commenced this action against the defendants, Omi Electric Appliance Company Co., Ltd.

---

[1] The plaintiffs refer to themselves collectively as Nationwide or the Nationwide parties. The defendants refer to the
plaintiffs collectively as the Imig Parties. *See* ECF No. 126. The parties also frequently interchange the names
Nationwide and Imig. As discussed below, the agreement at issue refers to Imig, Nationwide, Gumwand and Perfect
Products collectively as Imig. Therefore, for the sake of clarity, the Court will adopt the defendants' collective
designation for the plaintiffs which is consistent with the contract.

("Omi"), Beijing China Base Startrade Co., Ltd. ("Startrade") and Xu Shihui ("Xu")
(collectively, "Omi" or "the defendants"), asserting claims for breach of contract,
misappropriation of trade secrets, unfair competition laws and deceptive trade practices and
*prima facia* tort.  On September 19, 2017, Omi and Startrade also commenced an action against
Imig and Imig's owners, Mark and Scott Genoa,[2] asserting claims for breach of contract,
accounts stated, tortious interference with contract, defamation, unjust enrichment and quantim
meruit.  The cases were consolidated on May 3, 2018.  Before the Court are Imig's motion for
summary judgment and Omi's motion for partial summary judgment pursuant to Federal Rule of
Civil Procedure 56.  For the reasons set forth herein, Imig's motion for summary judgment is
denied and Omi's motion for summary judgment is granted, in part.

## BACKGROUND

The following facts, drawn from the parties' Local Civil Rule 56.1 Statements, the
parties' declarations, and the attached exhibits, are construed in the light most favorable to the
non-moving parties.[3]  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).
However, most of the facts asserted by the parties are in dispute.  As a result, in order to provide
a proper context for the Court's determination, the undersigned has frequently cited to the
parties' contentions set forth in their declarations.

---

[2] The plaintiffs include the Genoas when they refer to themselves collectively as the Nationwide parties.  *See* ECF
No. 123.  As such, the Court will include the Genoas when it refers to the plaintiffs collectively as Imig.
[3] Each party has submitted a 56.1 statement, counterstatement and statement of additional facts.  For the sake of
clarity, the Court has adopted the following citations:
     (1) the initial 56.1 Statement submitted by Imig is referred to as "Pls.' 56.1 Stmt.";
     (2) Imig's response to Omi's additional statements is referred to as "Pls.' 56.1 Counterstmt.";
     (3) Omi's response to Imig's 56.1 statement is referred to as "Omi's 56.1 Counterstmt.";
     (4) Omi's additional facts, which follow their counterstatement, is referred to as "Omi's Add. Stmt.";
     (5) Imig's additional facts are referred to as "Pls.' Add. Stmt";
     (6) Omi's responses to Imig's additional facts is referred to as "Omi's 2d Counterstmt."
Notably, the statements submitted by Omi are neither short nor concise as is required under the Local Rules.  *See*
Local Rule 56.1 (b).  In addition, Omi's statements set forth legal arguments.  The Court also notes that Omi filed a
separate Rule 56.1 statement ("Omi's 56.1 Stmt.") in connection with their cross motion that is largely duplicative
of the statements asserted in connection with the motion initiated by Imig.

### A.     The Parties

Imig, Nationwide, Gumwand and Perfect Products are New York corporations all doing business at 303 Smith Street, Farmingdale, New York 11735.  Am. Compl. ¶¶ 1-4.  Imig, Nationwide, Gumwand and Perfect Products are owned by two brothers, Mark and Scott Genoa. CV 17-5506, Compl. ¶ 14.  The Imig companies sell vacuum cleaners.  *Id.*  The defendant Omi is a limited corporation of the People's Republic of China with a principle place of business at No. 158-82, Huashan Road, Fengqiao Industrial Park, New District, Suzhou, Jiangsu, China.  Am. Compl.  ¶ 5.  Startrade is also a limited corporation of the People's Republic of China with a principle place of business at B-2306, Sun & Moon Plaza, Number 17, Fangcheng, Yuan, Fangzhuang, Beijing, China 100078.  *Id.* ¶ 6.  Omi and Startrade manufacture, produce and export vacuum cleaners, vacuum cleaner parts and accessories.  CV 17-5506, Compl. ¶ 13.  Imig alleges that Omi and Startrade are exporting goods to nonparty businesses located in New York. Am. Compl. ¶¶ 5, 6.  Xu is an individual residing in the People's Republic of China.  *Id.* ¶ 7.  He is a shareholder and the manager of Omi and Beijing China.  Xu Decl. ¶ 2; Omi's Add. Stmt. ¶ 1.

### B.     Events Leading Up to the 2014 Agreement

Sometime in 2000, Xu, then a sales agent for Beijing China Base Star Paper Co., Ltd. ("Star Paper"), a paper-goods manufacturer in China, began selling paper bags for vacuums to Gregory Seck ("Seck"), an individual working for an American company selling vacuum cleaning products.  Xu Decl. ¶ 6.  In 2003, Seck contacted Xu seeking assistance for one of Seck's customers who needed to source parts for a metal upright vacuum.  *Id.* ¶ 7.  Shortly thereafter, Xu was introduced to Scott and Mark Genoa in New York.  *Id.*  At the time, the Genoas owned Nationwide, a company that was distributing commercial vacuums and parts for brand name vacuum cleaner companies like Eureka.  *Id.*  According to Xu, Nationwide wanted to

3

create their own line of upright machines and have parts manufactured that would fit both the Eureka Sanitaire vacuum and new Nationwide upright models. *Id.*

Xu states that, in anticipation of selling their own vacuums, the Genoas formed two companies for their new business, Imig and Perfect Products. *Id.* ¶ 8; Omi's Add. Stmt. ¶¶ 6-7. The Genoas planned to sell the new line of upright machines under the brand name "Perfect," and, according to Xu, needed inexpensive and reliable manufacturers of vacuum parts in China that could be used in both Eureka's Sanitaire machines as well as in their own new machines. Xu Decl. ¶ 8. Xu asserts that because the plaintiffs had not previously manufactured vacuums, the plaintiffs could not provide him with any technical specifications or design drawings. *Id.* ¶ 9. Instead, they provided him with samples of the Eureka Sanitaire upright machines to reverse-engineer so that they could develop two Perfect vacuums - a 12"-size metal upright machine similar to the Sanitaire 866 (the "P101") and a 16"-size metal upright similar to the Sanitaire 899 (the "P102"). *Id.*; Omi's Add. Stmt. ¶ 8. Xu avers that the design for the Sanitaire model was a common upright vacuum design that had existed for decades and had been manufactured by various Chinese suppliers to a variety of companies. Xu Decl. ¶ 9. In fact, he says that many of the machine's smaller components were commercially available parts, commonly referred to as aftermarket products, that did not require new custom-made tooling or molds. *Id.*

Nonetheless, following the meeting, Xu contacted manufacturers of vacuum parts and identified an assembly manufacturer named Suzhou Suvac Electric Motor Co., Ltd. ("Suvac"), who could take the lead on producing the parts for and assembling the P101 and P102 machines. *Id.* ¶ 10. Xu also worked with engineers at Suvac and other component manufacturers to develop design specifications and, ultimately, to build prototypes. *Id.* However, for some reason, Suvac did not end up manufacturing the P101 and P102. *Id.* ¶ 12. Accordingly, Xu identified a new

metal parts manufacturer, Suzhou Zhong Fei Electric Co., Ltd. ("Zhong Fei"), who could assemble the P101 and P102 machines.  *Id.*

In November 2003, Scott Genoa visited several part manufacturing facilities as well as the Zhong Fei plant.  *Id*. ¶ 12.  During his visit, he agreed to pay Zhong Fei for the tooling needed to produce the P101 and P102.  *Id.*  Then, on August 29, 2004, Imig entered into a contract with Star Paper, as an agent for Zhong Fei and other part manufacturers, concerning the tooling the companies would use to make parts for Imig (the 2004 Agreement).  *Id.*  The 2004 Agreement, which was executed by Scott Genoa on behalf of Imig and Xu on behalf of Star Paper, states verbatim[4]:

> 1.  The tooling as per breakdown list page attached, including or not including concerned to the vacuum cleaners unit, Imig will pay the tooling cost of its mentioned, hereof the tooling will be 100% property of Imig. Imig has the authority to move the tooling to any other place without any limit.
>
> 2.  [Star Paper] has no any authority to sell the items as these tooling have been paid by Imig on the breakdown list.
>
> 3.  At time of the tooling money have been paid back to Imig, Imig still are the owner of the tooling, even the tooling have been damaged during the production.

Scott Genoa Decl. Ex. K.  Xu understood that any new tooling purchased by Imig was their property and could be moved to another manufacturer.  Xu Decl. ¶ 13.  He argues, however, that Imig had not retained any rights with respect to tooling used by manufacturers to produce aftermarket components.  *Id.*

In November 2003, Scott Genoa visited several part manufacturing facilities as well as the over the course of the next ten months, Zhong Fei and the part manufacturers worked with mold-makers to design and produce molds for each custom-made part of the P101 and P102.  *Id.* ¶ 14.  By October 2004, the manufacturers were ready to assemble the complete

---

[4] The contract contains numerous grammatical errors.

vacuum cleaners, which consisted of both custom-tooled parts and aftermarket components. *Id.* Shortly thereafter, Xu resigned from Star Paper and started the defendant Startrade, to export janitorial products abroad. *Id.* ¶ 15. Although Startrade was not a signatory to the 2004 agreement with Imig, Startrade did obtain an export license and coordinated with Zhong Fei to export finished upright machines to Imig. *Id.* ¶¶ 15-6. Startrade also provided Imig with spare parts made with its tooling as well as aftermarket vacuum cleaner parts. *Id.* ¶¶ 16-7. In addition, at the time, Startrade sourced after marker vacuum parts and janitorial products for other customers. *Id.* None of those aftermarket products were made with tooling paid for by Imig. *Id.* ¶ 17; Omi Add. Stmt. ¶ 17.

Then, sometime in 2005, Imig sought to expand the Perfect product line and requested that Xu arrange for the development of variations on the P101 and P102. Xu Decl. ¶ 18. Xu avers that he worked with engineers at Zhong Fei and other part manufacturers to design the requested variations. *Id.* ¶ 19. He also attests that while the cost of producing the additional tooling was shared among Imig, Zhong Fei and Zhong Fei's suppliers, Zhong Fei and its suppliers covered the costs associated with the initial engineering and design. *Id.*

Moreover, that same year, Imig sought to develop a commercial plastic backpack vacuum and sent Xu a prototype of a backpack machine, but the initial design failed to function properly. *Id.* ¶ 20. As such, Xu began working with engineers at a Chinese plastics manufacturer named Changshu Yade Industrial Co. Ltd. to design a new backpack machine. *Id.* Xu says that Startrade also paid for the tooling for the redesigned backpack. *Id.* Imig disputes this claim. Imig alleges that it worked directly with Xu's contact, Sal Buda, to design the backpack machine. *See* Scott Genoa Opp. Decl. ¶ 8. Imig also alleges that it paid for most, if not all, of the tooling costs. Pls' Counterstmt. ¶ 20.

Nevertheless, in late 2005, Zhong Fei became insolvent.  *Id.* ¶ 22; Xu Decl. ¶ 21.  Xu alleges that in order to continue producing the upright machines for Imig, he formed Omi and acquired Zhong Fei's production capabilities, including the entire metal parts assembly line.[5]  Xu Decl. ¶¶ 21-2.  In addition, Xu hired former Zhong Fei engineers, designers and assembly workers.  *Id.* ¶ 22.  As a result, beginning in March 2006, Xu's new company, Omi, took over as the assembly-manufacturer for metal parts and also managed the production of plastic parts for Perfect vacuum cleaners.  *Id.*  Xu claims that, at the same time, Omi began selling aftermarket products in the domestic Chinese market, including complete upright machines manufactured and sold by third-party suppliers.  *Id.* ¶ 23.

Xu also claims that, in 2006, Omi, Startrade and Imig entered into an oral agreement regarding their relationship because they never had an agreement that governed the tooling that Omi and its suppliers had developed for Imig.  *Id.* ¶¶ 23, 25.  According to Xu, the parties orally agreed that:

> a)  The three [companies] would agree to pricing for goods to be sold to Imig;
>
> b)  Imig would place orders for goods at the agreed-upon pricing;
>
> c)  Omi and Startrade would fulfill the orders on a FOB (Free-on-Board) Shanghai basis, meaning that Imig would be responsible for the freight costs and the risk of loss and title to the goods would pass to Imig at the port of Shanghai; and
>
> d)  Once the goods were delivered to the port, Imig [would be] responsible for payment for those goods at that time.

*Id.* ¶ 24.  Imig does not deny that it entered into an oral agreement with Omi.  Pls.' Counterstmt. ¶ 24.  It does, however, dispute the terms, including that it had agreed to pay on a FOB or would be responsible for payment at the port.  *Id.*

---

[5] Imig alleges that it contributed $100,000 toward that acquisition.  Pls.' Counterstmt. ¶ 23.

The parties' business relationship continued through 2014.  In fact, Xu claims that between 2006 and 2014, Omi developed additional product lines for Imig.  Xu Decl. ¶ 26. According to Xu, for each of the new products developed during that time period, Imig would send him products made by the plaintiffs' competitors and asked Xu to "duplicate them."  *Id.*  Xu would then work with Omi engineers and engineers at Omi's suppliers to reverse engineer commercially-available vacuum cleaners manufactured by Imig's competitors.  *Id.*  To this end, Xu says engineers in China prepared design drawings, prototypes and specifications for plastic molds.  *Id.*  Xu also contends that the cost of producing the plastic molds for the new products was shared among Omi, Imig and Omi's suppliers.  *Id.*  But he says that Imig did not contribute to the cost of designing the new products or the molds.  Once again, Imig disputes this fact.  Imig alleges that it, not Omi, developed the new lines.  Pls.' 56.1 Counterstmt. ¶ 26.  In fact, Imig claims that during that time period it obtained patents on some of the improvements.  *Id.*

In November 2012, Scott Genoa introduced Xu to Martin Whitbred ("Whitbred"), who had designed a prototype for a gum-removal steam cleaning machine in Europe.  Xu Decl. ¶ 27. The group wanted to develop a completely new steam cleaner that was superior in function to Whitbred's initial machine so Omi's engineers designed the "Gumwand." *Id.*  Xu asserts that Omi paid for the cost of the tooling for the Gumwand.  *Id.*  Xu also claims that Scott Genoa, Whitbred and he had orally agreed that Omi would manufacture the Gumwand and sell the product directly to customers in the Asia-Pacific region, as well as to Imig and Gumwand, Ltd. *Id.*  Finally, Xu contends that the parties agreed that Gumwand, Ltd. would have exclusive rights to sell the Gumwand in Europe and Africa and that Imig would have exclusive rights to sell the Gumwand in North America.  *Id.*

Omi also continued to manufacture parts that Xu says were designed to fit competing

vacuum cleaners, such as the Sanitaire. *Id.* ¶ 28. In fact, during that time period, Imig had entered into contracts with other vacuum cleaner brands, including Oreck and Bissell, to produce private-label versions of the Perfect vacuum cleaners. *Id.* Over time, Bissell became the largest customer for Imig and, in June 2012, Scott Genoa notified Xu that Imig was entering into a long-term contract with Bissell to be an exclusive supplier of commercial vacuum cleaners and parts. *Id.* ¶¶ 28-9; Omi's 56.1 Stmt. ¶ 28. According to the Genoas, their contract with Bissel was contingent on Omi's willingness to stop selling competing products in China. Xu Decl. ¶ 29. Xu claims that he never agreed to do so. *Id.* Imig claims Xu did agree but sold the products anyway. Pls.' 56.1 Counterstmt. ¶ 28.

In any case, it appears from the record that the parties began to have problems after Imig entered into the agreement with Bissel. For example, Xu claims that starting in 2012, Scott Genoa would often demand that Omi offer better pricing, improve product quality and increase the speed of production. Xu Decl. ¶ 30. Xu also asserts that Scott Genoa would complain to him that Bissell was threatening to terminate its long-term contract with Imig if Omi did not cooperate. *Id.* In fact, in April 2014, Scott Genoa advised Xu that Bissell had issued a formal warning that it would terminate its agreement with Imig if Omi did not manufacture and ship products faster. *Id.* ¶ 31. However, during his deposition, Scott Genoa admitted that he would occasionally falsely claim that demands were coming from Bissell because Xu seemed to have more respect for Bissell than for Imig.[6] Pls.' 56.1 Counterstmt. ¶ 31. Finally, in May 2014,

---

[6] Scott Genoa admitted at his deposition that, on occasion, he embellished or lied in his email communications. *See* Meyers Decl., Exh. 4. For example, when Scott Genoa was shown an email he sent about an Oreck price increase he explained the contents was "bullshit" and he was "just squeezing for a better number." *Id.* 198-99. He also acknowledged that he lied to Xu about signing a deal with Bissell. *Id.* 200-01. When he was shown an email he sent to Xu on January 14, 2015 in which he indicated receiving a call from a Bissell representative, he admitted that he had never actually received a call. *Id.* 217-18. In fact, Scott Genoa averred that "90 percent of [the email was ] a crock of shit." *Id.*

Scott Genoa asked Xu to stop selling the Gumwand to Whitbred and, in September 2014, accused Omi of selling parts made with Imig-paid tooling to Seck's company, Envirocare Technologies LLC ("Envirocare").[7]  *Id.* ¶¶ 32-3.

### C.   The 2014 Agreement

Despite these difficulties, according to Imig, in 2014, it sought to renegotiate the terms of the original 2004 Agreement between Imig and Star Paper because Imig had lost its copy of the agreement in Hurricane Sandy.  Scott Genoa Decl. ¶ 6.  Imig further claims that, in the fall of 2014, it entered into a new agreement with Omi pursuant to which Omi agreed to manufacture goods for the plaintiffs, including a variety of commercial and residential floor and surface cleaning machines as well as parts for those machines.  Mark Genoa Decl. Ex. A.  Indeed, pursuant to the terms of the 2014 Agreement, Omi appears to have agreed to produce, acquire, or use, as needed, tooling and molds in order to manufacture the goods.  *Id.*  The 2014 Agreement also provides that all goods manufactured with any tooling or "Confidential Information" of Imig's were to be sold exclusively to Imig.  *Id.*  Specifically, the 2014 Agreement provides:

> OMI shall not sell, offer for sale, or in any way advertise the goods manufactured with any tooling or "Confidential Information" of Imig to any third party, OMI shall not show images of the Goods in any advertising literature, print publication or webpage without the express written consent of Imig.

*Id.*  Finally, the 2014 Agreement provides that Imig had the right to terminate the agreement at any time "upon reasonable cause."  *Id.*

Omi does not deny the existence of the 2014 Agreement but does claim that Scott Genoa

---

[7] Imig commenced a patent infringement action against Envirocare on November 30, 2016.  CV 16-6617 (GRB).  As a result of certain rulings in that case, Imig now acknowledge that Omi and Startrade sold very few vacuum cleaner parts to Envirocare.  Pls.' 56.1 Counterstmt. ¶ 32.  Indeed, 90% of Omi's business with Envirocare was for bags and filters the parts it sold to Envirocare consisted of aftermarket products sourced from third-party manufacturers.  *Id.*
.

lied to Xu about the terms.  Xu Decl. ¶ 37.  To begin with, Omi notes that the 2014 Agreement is dated September 11, but Xu asserts he did not see the 2014 Agreement until October, when Scott Genoa visited Omi's facility in Suzhou, China.  *Id.* ¶ 33.  To this end, Xu asserts that Scott Genoa presented him with the 2014 Agreement at the end of a two-day visit to China and indicated that it had to be signed right away because he needed to depart to the airport immediately.  *Id.* ¶ 37.  Xu further contends that the 2014 Agreement was written in English and Scott Genoa refused to allow him to have additional time to have the document translated.[8]  *Id.* ¶ 36.  Xu also asserts that Scott Genoa told him that Bissell was requiring Imig to enter into the agreement as an addendum to Imig's existing contract with Bissell.  *Id.* ¶ 34.  He explained, in this regard, that the addendum, which Omi was required to sign, prohibited both Imig and Omi from selling Bissell-branded products to customers other than Bissell.  *Id.*  However, Scott Genoa stated that the agreement would be good for Omi because it ensured Omi's exclusive role as the manufacturer of Bissell vacuum cleaner products in China.  *Id.* ¶ 35.  Scott Genoa also led Xu to believe that unless they signed the 2014 Agreement, Bissell would terminate its long-term agreement with Imig causing Omi to also lose a large portion of its business.  *Id.*  Xu notes that the document had already been signed by Mark Genoa.  *Id.*  Accordingly, Xu says that he signed the 2014 Agreement that day relying on the fact that Scott Genoa would not mislead him because he had been a friend and business partner for over a decade.  *Id.* ¶ 36.

Imig disputes Xu's description of the events surrounding the execution of the 2014 Agreement.  First, Imig claims that it was Mark Genoa, not Scott Genoa, who presented Xu with the agreement while he was in China.  Pls.' 56.1 Counterstmt. ¶ 33.  Imig also asserts that it only

---

[8] The parties dispute whether Xu is fluent in English. Xu claims he is not fluent.  Omi's Add. Stmt. ¶ 3.  Imig argues that Xu is definitely fluent and often acted as Scott Genoa's English/Chinese translator during his trips to China. Pls.' 56.1 Counterstmt. ¶ 3.
.

demanded a new agreement because it thought that it had lost its copy of the 2004 Agreement in

Hurricane Sandy.  *Id.*  Moreover, while Imig acknowledges that the 2014 Agreement was written

in English, Imig claims that for years the parties had transacted all of their business in English

and the terms were virtually identical to the 2004 Agreement.  *Id.*  Finally, Imig asserts that Xu is

feigning a lack of sophistication.  *Id.*  Indeed, Imig claims that, at the time, Xu was running

several multimillion dollar international companies.  *Id.*

### D.      Incidents Leading to the Termination of the Agreement

The parties do not dispute that by late 2014, they began to have difficulty doing business

with each other.  Scott Genoa Decl. ¶ 7; Xu Decl. ¶ 42.  For example, Xu asserts that in

November and December 2014, Imig placed an extraordinarily large order for products to be

shipped before the Chinese New Year, which was on February 19, 2015.  Xu Decl. ¶ 42.

According to Xu, Imig knew that Omi and its suppliers' factories closed for an annual two-week

period around the Chinese New Year and it would normally take them two to three months to

manufacture and deliver goods to the Shanghai port for export.  *Id.*  As a result, Omi had to

operate around the clock to complete $1.2 million in orders before the 2015 Chinese New Year.

*Id.*

Xu further alleges that, despite that effort, in January 2015, Scott Genoa informed him

that he had identified a lower-cost alternative for Bissell-branded plastic machines in China and

demanded that Omi transfer all of the tooling its suppliers used for Bissell plastic products to one

of Omi's competitors.  *Id.* ¶ 43.  One month later, Scott Genoa sent Xu an email stating, for the

first time, that Imig had decided to terminate its relationship with Omi and demanding that Omi

transfer all of the tooling and technical specifications for products Omi had sold to Imig.  *Id.* ¶

44.  In addition, Xu avers that between February 25 and 27, 2015, Scott Genoa began threatening

12

legal action against Omi in the U.S. and China if Omi did not provide him with such tooling.  *Id.*
¶ 45.  Finally, Xu claims that Scott Genoa also indicated he would tell people in the industry that
Omi had betrayed Imig by selling Gumwand units to Whitbred, which Xu says he was permitted
to do.  *Id.*  Scott Genoa recalls requesting his tooling at the time but believes he did not mention
terminating the 2014 Agreement until the end of 2015.  Pls.' 56.1 Counterstmt. ¶ 46.  Imig also
disputes that Xu was permitted to sell Gumwands to Whitbred directly.  Pls.' 56.1 Counterstmt. ¶
42.

In any case, in early 2015, Scott Genoa refused to pay over $1.2 million in outstanding
invoices until all of the tooling for plastic machines was turned over to Imig.  Xu Decl. ¶ 45.  Xu
contends that Omi could not withstand the crush of having over $1.2 million in open balances for
more than a few weeks.  *Id.* ¶ 46.  Xu notes that, by that point, 90% of Omi's and Startrade's
business was dependent on Imig's orders.  *Id.* ¶ 44.  Accordingly, Xu says that he had no choice
but to reach an agreement with Imig whereby Omi would transfer tooling for two products to
Imig's new Chinese supplier in exchange for Imig paying its outstanding balance.  *Id.* ¶¶ 46-7.
As such, in April, Omi transferred the tooling for the BGU 8000 lightweight upright vacuum and
the C105 canister vacuum to a new manufacturer and Imig paid its then outstanding balance.  *Id.*
¶ 47; Omi's Add. Stmt. ¶ 45.

Despite the alleged threat of termination in early 2015, Imig continued to do business
with Omi throughout the year.  However, given Imig's refusal to pay for its 2014 orders until
Omi transferred the tooling for two machines to new manufacturers, Xu claims that he tried to
enforce Imig's obligation to pay for goods upon their delivery to the Shanghai port.  Xu Decl. ¶
48.  According to Xu, with the understanding that it would be required to pay for orders at the
Shanghai port, Imig placed orders on October 6, November 11, November 29, December 2,

13

December 10 and December 13, 2015.  Omi Add. Stmt. ¶ 51.  However, shortly after placing the

orders, Imig demanded that Omi return the balance of Imig's tooling to it.  Scott Genoa Decl. ¶

9; Pls' 56.1 Stmt. ¶ 2.

      Scott Genoa admits that he continued to place orders with Omi notwithstanding the fact

that he planned to terminate the parties' business relationship.  He says, in this regard, that

towards the end of 2015, it became extremely difficult to do business with Omi because Omi

would not communicate with Imig concerning its shipments.  Scott Genoa Decl. ¶ 8.  As a result,

by December 22, 2015, Scott Genoa and his brother decided that the plaintiffs' companies would

no longer do business with Omi and demanded that Omi transfer all of their tooling to another

manufacturer.  *Id.* ¶ 10.  Scott Genoa admits, however, that Imig wanted to have at least 6

months-worth of inventory to carry them over until the new Chinese factory was "up and

running." Omi Add. Stmt. ¶ 52.  Accordingly, on December 22, 2015, after placing several

orders, Scott Genoa emailed Xu claiming that Imig had an "ironclad contract" that prevented

Omi from selling his inventory to any other potential buyers.  Omi's 56.1 Stmt. ¶ 12.

Specifically, Scott Genoa stated:

> i have sent email after email.  i have spoken to you on the skype.  i have sent
> over many, many orders and still no one gets back to me.  i can not do business
> like this.  you obviously are not planning on shipping me any goods.  here is
> what i propose and i will only make this offer once. i will buy everything (all
> parts you currently have in the warehouse ) and i will need all of my tooling
> packed up immediately to be sent along with the parts.  we will draw up
> agreement stating that once everything is loaded on the trucks i will pay you all
> of the money i currently owe along with all the money for the parts and we will
> ship everything.  you have left me no choice and i have to move quickly with
> this as chinese new year is fast approaching.  i have tried, and tried to assure
> everyone that we want to continue doing business but obviously (based on no
> one returning my emails and no shipping schedule being sent) you just dont
> want to ship me any goods. as you know we have an ironclad contract stating
> that all of the tooling is mine and none of the items can be sold to no one but
> me. please dont make this get ugly. i cannot keep waiting and waiting for
> answers  i have to protect my company and i will spare no expense and also i

will do whatever is necessary to get what is mine. i did not want this to happen but you have left me no choice. I NEED YOU TO ANSWER ME RIGHT AWAY ON THIS AS IF I DO NOT HEAR FROM YOU BY TOMORROW I WILL START THE LEGAL PROCESS!! i dont know why you are making me do this but you have obviously made your decision. we skyped on friday and you told me no problem but obviously we have a big problem. again i need an answer from you on this as this is my final offer to you to rnake things as pleasant as possible to say im disappointed in you (again) is a huge understatement

Meyers Decl., Exh. 2. Two days later, on December 24, 2015, Scott Genoa emailed Xu a second

offer:

how about i buy all remaining inventory you currently have. also i sent a contianer (sic.) of hoses to you. what happened to that ?? if you have no workers to make product then let me buy everything in the factory. this way you can get all of your money and i can send the stuff and have it made. this is a major problem for me. i have to get inventory. you still have joe and his guys and they can make gumwands and you can get a smaller place as dont forget i sent you back over a quarter millon usd of paid gumwands that i want fixed and returned. thats 1,624,448.00 rmb. how am i going to get my money back if you dont fix and return the inventory. even though i have to pay for the fixed units i can still break even by selling the units (i also have over 5 millon rmb that i paid out for defective product and lawsuits ). this is a major problem. i can not wait weeks on this. if no one wants to work then ill hire some people to go in and pack up every single part you have in the warehouse and pay you for it. then i can get product made and shipped as this is just unacceptable. i think i should come to china and see what you have and work out a plan to get my products on the water before chinese new year. we still have 6 weeks before chinese new year. if you dont ship product then i stand to loose (sic.) millons of dollars and unfortunately you are going to be responsible for that money so its best to do something now while we still have time. this way you can make alot of money, i can get what I need, and we can continue with the gumwand. you need to answer me on this immediately as if I dont hear anything then you will force me to make other arrangements. please get back to me on this

Scott Genoa Decl. Ex. N.

### E.    Termination of the Agreement

On January 12, 2016, Mark Genoa sent Omi another email stating:

i need you to give me a realistic shipping schedule. this has nothing to do with money. i want to know what can ship and when. I copied Xu and yan on this

> email so we can go over the money. I NEED YOU TO IMMEDIATELY
> SEND ME A SHIPPING SCHEDULE FOR ALL ITEMS THAT ARE
> CURRENTLY ON ORDER AND WHEN THEY CAN SHIP!

Meyers Decl., Exh. 41.  The following day, Omi shipped a container, which arrived at the

Shanghai port on January 16, 2016.  Omi's Add. Stmt. ¶ 71.  That same day, January 13, 2016,

Scott Genoa emailed his contact at Bissell indicating that Imig was still trying to force Omi to

fulfill additional orders.  *Id.* ¶ 73.  On January 14, 2016, in response to Mark Genoa's email, Omi

informed Imig that it would not provide a shipping schedule until it received payments.  *Id.* ¶ 75.

On January 15, 2016, Imig claims it "formally" terminated the 2014 Agreement,

cancelled all of the orders not yet delivered and repeated the demand for the return of all tooling

that was used to make parts for Imig.  Scott Genoa Dec. ¶ 16, Ex. Q; Pls.' 56.1 Stmt. ¶ 13.  The

formal termination referred to in the submissions is an email, which Scott Genoa sent to Xu.  *Id.*

Ex. Q.  The email reads:

> hi xu
>
> i just want you to know that i know you have been selling my parts to greg and
> he in turn has been selling the parts to desco, steelcity. johhnyvac, tip top, and ae
> carter. if you do not give me my tooling i am going to sue the ass off of greg. i
> can legally get his books opened so we can find out exactly what you've been
> selling him and to whom he's been selling. he is going to go crazy on you when
> that happens. i already have the lawyer lined up here in the states just waiting
> to give me the word to start the lawsuit against envirocare. i am going to do
> whatever it takes to bring you down for what you did to me. the only thing that
> will stop this from happening IS FOR YOU TO GIVE ME MY TOOLING !! i
> am formally terminating our contract. i will be more then fair with you if you
> cooperate but i swear to you if you dont get back to me by monday with a
> favorable answer then whatever happens next is all on you. you are by far the
> most dishonest business person i have ever dealt with. what comes around goes
> around. you screwed me with martin and you lost over a hundred thousand. now
> your screwing around and telling ametek that bissell wants the motors (which
> we both know is a complete lie as bissell would never do business with you) and
> no matter what you now have lost all of my business. if you do not immediately
> surrender all of my tooling i will try my hardest to make sure you never do
> business in the u.s. or china again. once i sue greg he will cut all ties with you.
> dont be stupid. You screwed up and got caught again. dont make it worse. you

> know how crazy I can get and i promise i will spend whatever it takes to bring all of you down. i just want this to end peacefully so even though you screwed me again i am giving you an opportunity to do the right thing and give me what is mine (then i will pay you all of your money). be smart and do the right thing. i need to hear from you by Monday
>
> thanks scott

*Id.* (spacing altered to provide clarity).

Omi does not dispute receipt of this email but it does deny that the contract was "terminated." Omi 56.1 Counterstmt. ¶ 13. Indeed, despite Judge Brown's ruling that the 2014 Agreement is valid, an issue which is discussed in further detail below, Omi continues to argue that Scott Genoa could not have terminated the 2014 Agreement because it was not valid in the first place. *Id.* To this end, Xu contends that it was not until 2016, that he learned that the 2014 Agreement had not been required by Bissell and did not benefit Omi in any way. Xu Decl. ¶ 37. In fact, Xu now says that, unbeknownst to him, the 2014 Agreement granted rights to Imig to confidential information that Omi and its suppliers had developed and shared in the cost of producing. *Id.*

Omi further argues that even if the 2014 Agreement was valid, Imig had breached the agreement first by refusing to pay its balance on the orders placed between October and December 2015. Omi 56.1 Counterstmt. ¶ 13. Specifically, with respect to the timing of the termination, Xu contends that by January 2016, Omi had completed nearly $450,000 worth of Imig's orders. Xu Decl. ¶¶ 37, 53. In fact, on December 25, 2015, Omi had sent the first shipment, two containers of goods, to Imig, which arrived at the Shanghai port on December 28, 2015. *Id.* ¶ 56. On December 29, 2015, Omi demanded payment for that shipment in the amount of $450,193.22. Omi's Add Stmt. ¶ 62. Imig agreed to pay for an earlier November order but indicated that it would not pay for the December order until sometime in January, when

Mark Genoa returned from vacation.  Xu Decl. ¶ 59; Omi Add. Stmt. 63.

Omi claims that based on the representation that it would be paid in January, Omi

shipped another container to Imig on January 6, 2016.  Xu Decl. ¶ 60.  Again, Omi asked Imig to

pay in advance for those goods.  Pls.' 56.1 Counterstmt. ¶ 48.  Imig refused to pay for the second

shipment and indicated that it would only pay for the goods if Omi returned all of its tooling.  Xu

Decl. ¶¶ 60-3; Meyers Decl. Ex. 42.  Scott Genoa admits that, at the time, he wanted to increase

the amount of money that he owed to Omi in order to create the maximum leverage over Omi

when he demanded the return of Imig's tooling.  Omi Add. Stmt. ¶ 53.  In fact, the following

day, Imig cancelled the balance of the orders[9] and indicated that it would not pay for any of the

approximately $450,000 owed to Omi on the prior shipments until Omi returned all the tooling.

Xu Decl. ¶ 60; Omi Add. Stmt. ¶¶ 77-8.

### F.    The Return of the Tooling and Other Disputed Facts

With the exception of the tooling for the BGU 8000 and the C105, Omi did not return any

tooling to Imig after Imig indicated that it was terminating the parties' relationship.  Pls.' 56.1

Stmt. ¶ 4.  As a result, on February 2, 2016, Scott Genoa sent a letter to Xu written by an

attorney demanding the return of tooling.  Omi Add. Stmt. ¶ 88.  Omi did not comply and Imig

claims that it was forced to purchase tooling from another supplier.  Mark Genoa Decl. ¶¶ 7-8.

According to Mark Genoa, Imig paid $1,119,785.35 to replace the tooling that Omi refused to

turn over to its new manufacturer.  *Id.* ¶ 9.  Omi disputes these facts.  It asserts that Scott Genoa

never demanded the return of the tooling in December 2015, but rather offered to terminate the

parties' relationship and buy all of Omi's inventory.  Omi 56.1 Counterstmt. ¶ 4.  Omi also

contends that Imig cannot substantiate how much it paid for the alleged replacement tooling.[10]

---

[9] The parties dispute the value of the unshipped orders.  Omi Add. Stmt. ¶ 78, Pls.' 56.1 Counterstmt. ¶ 78.

[10] To this end, Omi asserts that Imig's calculation is based on records, including depreciation schedules, which

Omi 56.1 Counterstmt. ¶ 7.

The parties also dispute whether Imig had breached any material terms of the 2014 Agreement prior to the date of the alleged termination.  Imig contends that it was not in breach as of December 22, 2015.  Pls.' 56.1 Stmt. ¶ 5.  Omi argues that Imig had at least one outstanding balance due on the date of termination for Invoice Number 15NW1030.[11]  Omi's 56.1 Counterstmt. ¶ 5.  The parties also dispute which companies were bound by the 2004 Agreement, the subsequent oral agreement and the 2014 Agreement.  To this end, Imig claims that Imig and Startrade never entered into an agreement.  Pls.' 56.1 Stmt. ¶ 9, 10.  Omi claims that Imig never distinguished between Omi and Startrade and had, in fact, been ordering parts from Startrade since 2005.  Omi's 56.1 Counterstmt. ¶ 9, 10.

In addition, the parties disagree as to the status of the orders as of the date the 2014 Agreement was allegedly terminated.  Imig contends that Omi did not produce any of the goods that were the subject of the cancelled orders until at least March or April 2016.  Pls.' 56.1 Stmt. ¶ 14.  Omi contends that it immediately began filling orders that it had received between October and December 2015.  Omi's 56.1 Counterstmt. ¶ 14.  Indeed, Omi argues that although Imig had cancelled its November and December 2015 orders, the goods that were the subject of those orders were either completed or in the final assembly process at Omi's factory when the Chinese New Year factory closure began on February 8, 2016.  *Id*.  Moreover, while Omi acknowledges that it did not ship any of the goods covered by the cancelled orders, Omi claims that it offered to deliver finished goods to Imig in March.  *Id*. ¶ 11.

---

Imig's own accountant, Justin Popick, testified contains multiple errors and inaccuracies.  *See* Meyers Decl., Exh. 61 at 98:2-99:9; 104:5-105:16; 223:6-223:25; 230:5-232:18; 246:8-247:7; 221:16-224:17.  Omi also claims that Popick had no documentation to support $800,000 in alleged retooling costs or to support their deprecation calculation. Notably, the parties also dispute exactly what tooling was made by Omi or what was paid for such tooling.  Omi's 56.1 Counterstmt. ¶ 7.

[11] Imig argues that the goods reflected on Invoice 15NW1030 were ordered from Omi not Startrade.  Pls.' 56.1 Stmt. ¶ 8, 9.

They parties also disagree as to the value of the undelivered goods and whether Omi suffered any additional losses as a result of the cancellation.  Omi claims that the finished, undelivered goods valued $459,540.54.  *Id.* ¶¶ 95-6; Xu Decl. ¶ 72.  Omi further contends that it was unable to mitigate that loss because Imig had taken the position that the goods could not be sold to third parties.  Omi 56.1 Stmt. ¶ 26.  In response, Imig argues that Omi has produced no evidence as to the value of the undelivered goods.  Pls.' 56.1 Counterstmt. ¶¶ 78, 95-6.  Imig also asserts that despite Omi's contention regarding the timing of the completed orders, the goods could not have been completed until March or April because suppliers were not providing Omi with parts.  Scott Genoa Decl. ¶ 29.

Moreover, Imig alleges that it cancelled its orders because Omi refused to provide any delivery dates and was responding to its inquiries evasively.  Pls.' Add. Stmt. ¶ 5.  Omi responds that by January 2016, Imig was approximately $1 million in arrears, and thus, it would not commit to delivery dates until Imig would commit to paying for the goods.  Omi's Add. Stmt. ¶ 83; Omi's 2d Counterstmt. ¶ 5.  Of course, Imig disputes that the goods at issue totaled $1 million.  Pls.' 56.1 Counterstmt. ¶ 83.

Finally, Omi asserts that in February 2016, Xu tried to comply with Genoa's demands and continue doing business because Xu had to pay its suppliers, workers and landlord.  Omi's Add. Stmt. ¶ 89.  In fact, Omi claims that at the time of the termination, it did not have any cash reserves to pay its suppliers.  Omi's Add. Stmt. ¶ 90.  Imig responds that Omi has not produced any evidence to support its claim that it had financial obligations to suppliers, workers and its landlord.  Pls.' 56.1 Counterstmt. ¶¶ 89-90.[12]

---

[12] The parties have included numerous facts in their 56.1 statements regarding Omi's claim for tortious interference. Although Omi asserted seven causes of action, including claims for tortious interference and defamation, Omi is only seeking summary judgment on its first two causes of action sounding in breach of contract.  Accordingly, the Court has not included a discussion of those facts in this decision.

G.      **Procedural History**

As indicated above, Imig commenced this action against Omi by filing a complaint on February 5, 2016.  However, Imig had difficulty with international process service so Omi was not served until October 26, 2016.  ECF No. 16.  Nonetheless, twenty-two days later, after the defendants failed to answer, Imig immediately requested the entry of a certificate of default.  ECF No. 18.  That same week, Nationwide and Imig commenced a patent infringement action against Steel City Vacuum Co., a Pennsylvania corporation that had allegedly acquired infringing products from Startrade.  *See* 16-cv-06223-DRH-ST, ECF No. 1.  Shortly thereafter, Nationwide and Imig commenced another action against Envirocare Technologies International, Ltd. and Envirocare Technologies, LLC (collectively, "Envirocare"), charging Envirocare with patent infringement and alleging that it had violated the Defend Trade Secrets Act of 2016.  *See* 16-cv-06617-GRB, ECF No. 1.

In this matter, motion practice concerning the defendants' default took place throughout 2017.  However, by September 19, 2017, Omi and Startrade had commenced their own action against Imig and Imig's owners, Mark and Scott Genoa.  *See* 17-cv-05506-GRB, ECF No. 1.  Ultimately, in April 2018, Omi's motion to set aside the default was granted and Imig's motion for a default judgment was denied.  Around the same time, the parties agreed to consolidate the Imig and Omi cases.  Order dated 4/25/18.

Before Omi's time to answer the complaint in the 2016 Imig action had expired, Imig filed an amended complaint.  ECF No. 54.  Then, one week later, Imig withdrew its counterclaim in the Omi matter for a violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et al.*  It appears the voluntary withdrawal was motivated by Judge Brown's May 20, 2018 decision in the Envirocare case.  Specifically, Judge Brown had granted Envirocare's motion for summary

judgment on Nationwide's and Imig's patent and trade secret claims and directed counsel to confer concerning the effect of that decision, if any, upon the claims in this matter.  Judge Brown also granted summary judgment in favor of Steel City in all respects and directed the Clerk of the Court to enter judgment in Steel City's favor.  16-cv-06617-GRB, ECF No. 57.[13]

The Steel City matter did not, however, close.  By that time, Steel City had asserted two counterclaims for unenforceability due to patent misuse, so discovery continued in that matter as well as in this consolidated action and the Envirocare case.  In addition, in August 2018,  Omi filed a motion to dismiss counts I, III, IV and V of Imig's amended complaint filed in this matter, to dismiss all claims against Startrade and Xu, to strike Imig's claims for punitive damages and to narrow Imig's remaining claims.  On October 5, 2018, Judge Brown granted the motion, in part, and denied it, in part, leaving only Imig's breach of contract claim asserted against Omi. Notably, in that decision, Judge Brown dismissed Imig's conversion and misappropriation claims finding that they were duplicative of the breach of contract claim.  In doing so, he found that Omi's argument that the contract was invalid to be unavailing.

Five months later, Judge Brown also dismissed the Envirocare complaint in its entirety. 16-cv-06617-GRB, ECF No. 76.[14]  On March 18, 2021, the Court then granted Nationwide's and Imig's motion for judgment on the pleadings as to Envirocare's counterclaims.

The cross motions in this consolidated action, the motions now before the Court, were filed on January 27, 2021.

## DISCUSSION

### A.    Standards of Law

---

[13] Nationwide and Imig appealed the ruling with respect to Steel City Nationwide to the Court of Appeals for the Federal Circuit, who issued its summary affirmance of ruling on June 20, 2019.

[14] Once again, Nationwide and Imig appealed the decision to the Court of Appeals for the Federal Circuit.

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*)); *see Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (same).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted). However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine

issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

### B.     Imig's Breach of Contract Claim

*1.     Pleading Requirements*

The Court must first address Omi's argument that Imig did not plead its "current" breach of contract claim in the amended complaint.  Specifically, Imig is now arguing that it can prove as a matter of law that Omi breached Section 5 of the 2014 Agreement by refusing to return any of Imig's tooling after Imig terminated the parties' relationship.  Pls.' Mem. at 2-7.  To this end, Imig seeks summary judgment against Omi for $1,119,785.35, plus interest, which Imig claims is the amount it paid a new supplier to replace the tooling that Omi refused to return.  However, this allegation is substantially different from the breach of contract claim set forth in the amended complaint.

Notably, count II of Imig's amended complaint simply provides:

> The actions of the individual known as Xu Shihui and his controlled
> companies, including at least Omi and Beijing China are breaches of the
> contracts and agreements they have with the Plaintiffs, and are not justified by
> any action of the Plaintiffs.

Am. Compl. ¶ 36.  A liberal reading of the pleading suggest that the following factual allegations where intended to support that claim:

> 20.  Engineering information developed by [Imig] to be used by [Omi] for their
> products only included the formulation of materials, engineering specifics for
> the testing and evaluation, production, design, configuration, and tolerances for
> the various parts of the vacuum cleaners and steam cleaners and, included
> prototypes sent to [Omi] that included vacuum formed cannisters and electrical
> layouts used to make some of [Imig's] back pack vacuum cleaners, and sample
> vacuum cleaners to be used to create the Perfect line of vacuums.
>
> 21.  Such knowledge, information and prototypes . . .  can be termed "know-
> how" and enabled [Omi] to test, evaluate and manufacture the products of the
> [Imig] with the required quality standards, and such "know-how" is fully
> owned by [Imig]. . .. Such knowledge and information is not generally known
> or readily ascertainable through appropriate means by other persons in

competition with [Imig]. . ..

22.  Such confidential "know-how" forming trade secrets of [Imig] include
the formulations and manufacturing processes of various plastic parts including
the fan blades used in the motors for the Perfect line of products and the trade
secret "know-how" regarding the engineering and design of components used
in the production of motors to prevent over-heating; and formulations and
manufacturing processes of the other plastic parts, to provide the enhanced
structural strength and endurance required by the quality standards required by
[Imig]. . ..

23. Such know how and trade secret information provided to [Omi] enabled [it]
to commence manufacture of the [several] vacuum cleaners and parts . . . and
the steam cleaner known as the 'Gumwand'. . ..

*           *           *

25.  As part of the contractual arrangements [Imig] have with [Omi] [agreed]
that all confidential information and know-how used by [Omi] for the
manufacture and testing of products for [Imig] shall not be disclosed to others
and shall not be used for the manufacture of products for others; and that all
tooling and know how used for the manufacture of products of [Imig] shall be
used only for the manufacture of products for [Imig]
and no others.

*           *           *

27.  [Imig has ] learned that [Omi has] been using the tooling and confidential
trade secret and know how information of [Imig] for the manufacture and sale
of products . . . to others in the State of New York and elsewhere in direct
competition of [Imig].

Id. ¶¶ 21-27.  As is apparent, there are no factual allegations in the amended complaint

describing Omi's failure to return tooling or Imig's need to pay its new supplier to replace the

tooling.  In fact, a review of the docket sheet suggests that between February 6, 2016 and August

2019, while the related lawsuits were still pending, Imig had focused on Omi's "use" of its

confidential information in violation of Section 3 of the 2014 Agreement governing the

disclosure of confidential information.  Mark Genoa Decl. Ex. A.

According to Omi, the first time Imig referenced a claim for damages based on Omi's

25

failure to return the tooling under Section 5 of the Agreement was during a meet and confer in August 2019, three years after this action had been commenced. *See* ECF No. 104. When Omi's counsel responded that the amended complaint did not reference the failure to return the tooling or the fact that Imig had been damaged by the need to acquire new tooling, Imig's counsel argued that his client's claim that Omi was "using" confidential information was sufficient to put it on notice of the broader claim. Nevertheless, two months later, Imig's counsel served Omi with a supplemental automatic disclosure. The supplemental disclosure identified Mark and Scott Genoa as persons having knowledge of Omi's breaches including, but not limited to, Omi's breach of the 2014 Manufacturer's Agreement "by failing to return Imig's tooling." ECF No. 104-4.

Pursuant to Fed. R. Civ. P. 8(a), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief [] and . . . a demand for the relief sought . . .." Fed. R. Civ. P. 8(a). "Given the Federal Rules' simplified standard for pleading, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 514, 122 S. Ct. 992, 998, 152 L. Ed. 2d 1 (2002) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed.2d 59 (1984). Indeed, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Id.* (citing Conley v. Gibson, 355 U.S. 41, 48, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957)). Even so, the "liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." *Hickey v. State Univ. of New York at Stony Brook*

*Hosp.*, No. 10-CV-1282 JS AKT, 2012 WL 3064170, at *5 (E.D.N.Y. July 27, 2012)

In this case, Imig certainly failed to assert a claim based on the failure to return its tooling in the amended complaint.  In addition, despite receiving several decisions in its other cases suggesting that its misuse of confidential information claim might fail, Imig never sought to amend the pleading.  Nevertheless, Omi admits that it has been on notice since August 2019 that Imig intended to broaden its "use of confidential information claim" to include the failure to return tooling.  As the main objective of Rule 8(a) is to provide a party with notice, the Court will not dismiss the claim based on a failure to plead.

       *2.*    *Contract Ambiguity*

The next issue the Court must decide is whether the contractual provision relied upon by Imig is ambiguous.  *Sea Tow Servs. Int'l, Inc. v. Pontin*, 607 F. Supp. 2d 378, 386 (E.D.N.Y. 2009) ("[w]hether a contractual provision is ambiguous is a threshold question of law to be determined by the [C]ourt).  As noted above, Imig argues in its motion papers that it can prove as a matter of law that Omi breached Section 5 of the 2014 Agreement by refusing to return any of Imig's tooling after Imig terminated the parties' relationship.  Pls.' Mem. at 2- 7.  Section 5 provides, in pertinent part:

> Imig shall have the right, in its sole and absolute discretion, to terminate the Relationship or to terminate OMI's right to possess (or) access the Confidential Information, *at any time upon reasonable cause.*

Mark Genoa Decl. Ex. A (emphasis added).  However, the term "reasonable cause" is not defined in the agreement.  *Compare Fioto v. Manhattan Woods Golf Enterprises, LLC*, 270 F. Supp. 2d 401, 407 (S.D.N.Y. 2003), aff'd sub nom. *Fioto v. Manhattan Woods Enterprises LLC*, 123 F. App'x 26 (2d Cir. 2005) (where the agreement defined reasonable cause as fraud, misappropriation or embezzlement; negligence; willful disobedience or misconduct in the

27

performance of duties; criminal or immoral behavior; disparagement; and failure to meet the sales quota).

Here, the intended definition of "reasonable cause" is essential because Imig claims that it was entitled to terminate the 2014 Agreement based on a lack of communication.  Indeed, as evidence of such "cause," Scott Genoa has provided the Court with emails he exchanged with representatives of Omi between December 2, 2015 and December 24, 2015 demanding shipping schedules.  Scott Genoa Decl. ¶ 8, Ex. L.  Yet, a careful review of those email chains suggests that Omi representatives were, in fact, responding to Imig's inquiries about shipping dates albeit not to Scott Genoa's satisfaction.  For example, there is at least one email from Omi's representative, Emma, that states " hello Scott, pls find attached the shipping schedule (12/9 container you already confirmed) if the hose can arrive on the 15th Dec. then we will try to ship next container on the 30th Dec. and all the left items will be shipped in Jan."  *Id.*  Similarly, in or around December 10, 2015, Scott Genoa wrote to Omi regarding a container that was supposed to ship but didn't because there was a problem with some of the motors.  *Id.*  It appears that Xu had advised him of the delay the previous day.  *Id.*  In addition, that same day, Emma, responded to Scott Genoa's email indicating that she had some questions but that a revised schedule would be sent "later."  Given these exchanges, jurors could certainly conclude in this case that Omi's alleged lack of communication was not the type of conduct intended by the parties to be a ground for termination.  *See Sea Tow Servs. Int'l, Inc.*, 607 F. Supp. 2d at 386 (E.D.N.Y. 2009) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) ("'when . . . the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.'").

### 3.    Other Factors Weighing against Summary Judgment

Even if the terms of the 2014 Agreement were unambiguous, Imig's motion would still fail.  To begin with, Imig contends that it first terminated the 2014 Agreement by email on December 22, 2015.  Meyers Decl., Exh. 2.  Imig also, notably, contends that it was not in breach as of December 22, 2015.  Pls.' 56.1 Stmt. ¶ 5.  However, the December 22 email simply states "i can not do business like this." In fact, the record is clear that the parties continued to do business after the email was sent.  For example, Omi shipped another container to Imig on January 6, 2016, which it accepted.  Xu Decl. ¶ 60.   Accordingly, the December 22 email does not constitute an unambiguous termination of the parties contractual relationship.

In addition, the events leading up to the termination could support a finding that Scott Genoa's reliance on the alleged lack of communication to terminate the agreement was a contrived excuse.  According to Xu, by 2012, Scott Genoa would often demand that Omi offer better pricing, improved product quality and increased production speed.  Xu Decl. ¶ 30.  Xu also claims that, in December 2014, Imig placed a large order to be shipped before the Chinese New Year.  *See* Xu Decl. ¶ 4.  Xu contends that although Omi worked around the clock to complete the order, by January 2015, Scott Genoa informed him that he had identified a lower-cost alternative for Bissell-branded plastic machines in China and wanted all of the tooling transferred to one of Omi's competitors.  *See* Xu Decl. ¶¶ 42-3.   In fact, Xu asserts that by the end of 2015, although Imig continued to place orders with Omi, Scott Genoa had repeatedly threatened termination.  Xu Decl. ¶ 48.

Moreover, there is certainly a difference of opinion with respect to the meaning of the term "tooling" in the 2014 Agreement.  Section 2 of the Agreement provides:

> Omi has and will continue to produce or acquire molds, machine parts, tools and processes for the purpose of manufacturing the Goods for Imig and any

> and all such machine parts, tools, and processes shall be defined as Tooling for the purpose of this Agreement.
>
> Imig and Omi agree that any and all such Tooling and/or molds are the exclusive property of Imig; and any and all such Tooling and/or molds shall be used only for the manufacturing of the Goods for Imig.
>
> Imig and Omi agree that, should either party terminate the Relationship, all Tooling and molds shall remain the exclusive property of Imig; and in the event of such termination all Tooling and molds shall be turned over to Imig.

Mark Genoa Ex. A.  Based on this provision, Imig argues that Omi was required to return all of the Tooling used to manufacture Imig's products regardless of who paid for the Tooling once the parties' relationship had been terminated.  Pls. Mem. at 4.  Setting aside the issue of who paid for the tools, Omi still claims that, to date, Imig has not been able to identify which tooling was allegedly made after Omi was formed in 2006.  Omi's 56.1 Counterstmt. ¶ 119.  In fact, Omi has repeatedly argued that the vacuum cleaners they assembled for Imig consisted of both custom-tooled parts and aftermarket components that would not be considered Imig's Tooling.  Accordingly, the intent of the parties as to which items were to be turned over to Imig upon termination is also a matter of inquiry for a jury.

Finally, Imig's performance under the terms of the agreement is a question for the jury.  "Under New York law, the 'essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach.'" *Innovative Biodefense, Inc. v. VSP Techs., Inc*., 176 F. Supp. 3d 305, 317 (S.D.N.Y. 2016) (citing *LaRoss Partners, LLC v. Contact 911 Inc.,* No. 11 Civ. 1980 (ADS) (ARL), 2015 WL 2452616, at *6 (E.D.N.Y. May 21, 2015)).  The parties dispute whether Imig had breached its obligations under the contract before a demand for the return of the tooling had been made.  *Id*. ¶¶ 42-53.  Indeed, prior to the December 22 email and the subsequent formal termination on January 16, 2016, Omi

30

had begun filling Imig's late 2015 orders but Imig refused to pay for the shipments.  Xu Decl. ¶¶ 56, 59-60.  In fact, even if the Court were to consider December 22, 2015 as the date of termination, which Imig urges the Court to do, Omi claims that Imig had at least one outstanding balance due for Invoice Number 15NW1030 as of the date Imig first mentioned not wanting to do business in an email.[15]  Omi's 56.1 Counterstmt. ¶ 5.  For all these reason, Imig's motion for summary judgment is denied.[16]

### C.      Omi's Breach of Contract Claim

Having determined that summary judgment should be denied with respect to Imig's breach of contract claim, the Court turns its attention to the seven claims pled by Omi.  In its cross motion, Omi argues that it is entitled to partial summary judgment against Imig on its first and second causes of action sounding in breach of contract.  Omi's first cause of action is for "Breach of the Agreement as to the Shipped Products."  *See* 77-cv-05506-GRB, ECF No. 1, ¶¶ 55-9.  To this end, Omi claims that Imig breached the 2014 Agreement by wrongfully terminating the contract and failing to pay for the goods Omi had delivered in the amount of $450,193.  Omi Mem. at 1-2.  The second cause of action is for "Breach of the Agreement as to Unshipped Products." *See* 77-cv-05506-GRB, ECF No. 1, ¶¶ 60-4.  Omi similarly argues that Imig wrongfully terminated the 2014 Agreement and failed to pay $428,254 in ordered and assembled products.  *Id.* at ¶ 31.

With respect to the first claim, Imig acknowledges in its memorandum, that Omi's first claim for breach of contract, third claim for accounts stated and sixth claim for unjust enrichment

---

[15] Imig contends that it ordered from Omi, and not Startrade, the goods that are the subject of Invoice 16NW1003. *See* Decl. Exs. T, V.  It also correctly notes that Xu stated at his deposition that Imig's failure to pay for its orders to not play a role in Omi's decision to retain the tooling.  *See* Scileppi Decl. Ex. U at 276:13-19.  However, Xu's rationale for retaining the tooling does not negate the fact that a reasonable juror could find that Imig had failed to perform under the contract.

[16] Given this determination, the Court need not address Omi's argument that it was entitled to retain the Tooling under the "mold lien law."

are valid.  *See* Imig Mem. at 9.  In each of those claims, Omi seeks to recover damages in the amount of $450,193, plus interest, based on Imig's failure to pay for goods which it received.  While the parties dispute Startrade's, as opposed to Omi's, entitlement to recover on the last of the four invoices, Imig has recognized the validity of Omi's claims.  Accordingly, the Court need not address whether Startrade can independently prove the existence of a contract based on the alleged duplicative invoices and grants Omi's motion for summary judgment with respect to its first cause of action for breach of contract. [17]

The Court cannot, however, grant Omi's motion for summary judgment with respect to its second breach of contract claim.  Nor does the Court find that the claim should fail as a matter of law as urged by Imig.  It warrants mention that Imig states in its memorandum that "Omi and Startrade seek damages for breach of contract for two types of undelivered goods [in their second claim] . . . (i) goods that [Imig] ordered, and (ii) goods that [Imig] did not order."  Imig Mem. at 11.  This statement mischaracterizes Omi's second cause of action.  It is true that Omi is seeking damages for product that was never shipped to Imig but was the subject of orders submitted to Omi pursuant to the 2014 Agreement, which Omi claims Imig wrongfully terminated.  Nothing in the claim suggest Omi is seeking damages for goods that were never ordered.  Nonetheless, given the parties dispute concerning Imig's right to cancel the contract at any time, which the

---

[17] Omi did not move for summary judgment on its accounts stated claim but it warrants mention that Omi could have also prevailed on this claim had the Court found the contract to be invalid. "To assert an account stated claim in a complaint, a plaintiff must allege that '(1) an account was presented, (2) the account was accepted as correct, and (3) the debtor promised to pay the amount stated.'" *Fort Prods., Inc v. Men's Med. Clinic, LLC,* No. 15-CV-00376 (NSR), 2016 WL 797577, at *3 (S.D.N.Y. Feb. 23, 2016) (citing *Nanjing Textiles IMP/EXP Corp., Ltd. v. NCC Sportswear Corp.,* No. 06 Civ. 52, 2006 WL 2337186, at *12 (S.D.N.Y. Aug. 11, 2006)).  Imig placed orders with Omi on October 6, November 11, November 29, December 2, December 10 and December 13, 2015 and refused to pay the amount due on those "contracts" which were completed.  *See* Omi Add. Stmt. ¶ 51.  Once again, given this finding, the Court need not address Imig's argument that the third and sixth claim for accounts stated and unjust enrichment must fail as against Startrade.

Court has found to be a proper question for a jury, the Court cannot rule as a matter of law on Omi's claims for damages for the ordered but unshipped goods.  The parties also dispute whether Omi attempted to tender delivery following the purported termination.  Finally, a question of fact exists as to the value of the undelivered and cancelled goods.  Accordingly, Omi's second claim cannot be disposed of summarily.

### D.  Omi's Remaining Claims

Imig also seeks summary judgment with respect to Omi's fourth cause of action for tortious interference with contact, fifth cause of action for defamation and seventh cause of action for *quantum meruit*.[18]  As the Court has repeatedly stated, the resolution of each of these claims involves facts that are in dispute.  For example, Imig claims that Omi's tortious interference claim must fail because Omi "had no evidence" that it was damaged when Imig induced Omi's motor supplier, Suzhou Rise Motor Company ("Rise'), to sell motors directly to Imig.  Imig. Mem. at 14-5.  In contrast, Omi contends that it worked with Rise for years to engineer and develop iterations of prototypes, the embodiment of which was the tooling.  Omi. Mem. at 23-24.  It further argues that its damages can be inferred because the value of the lost time and effort that went into creating a functional product far exceeds the cost of its raw materials on which Imig relies.  *Id.  See e.g., McCoy Assocs., Inc. v. Nulux, Inc*., 218 F. Supp. 2d 286, 293–94 (E.D.N.Y. 2002) (discussing cases in which plaintiffs were entitled to proceed to trial despite uncertainty as to the amount of loss).

Similarly, with respect to the defamation claim, Imig contends that Omi's entire claim rest on letters that it sent to Omi's affiliates stating, "no more than [Imig] suspected that Omi and Startrade had breached their contract with [Imig] by selling [Imig's] proprietary parts to third

---

[18] The Omi parties have withdrawn their claim for *quantum meruit.*  Omi. Mem. at 23, n.16.

parties." Imig. Mem. at 17-8.  Omi maintains that Scott Genoa told Omi's suppliers that Omi dishonestly misappropriated the confidential information and tooling that belonged to Imig.  *See* Omi Counterstmt. ¶ 103.  In other words, according to Omi, Scott Genoa's statements were not limited to stating that Imig had breached an agreement, Scott Genoa effectively stated that Omi had "stolen "tooling from him.  Omi. Mem. at 24-5.  In sum, the Court finds that these claims also involve questions of fact that can only be properly resolved by a jury.

### E.      Abandonment of Claim

Finally, in its memorandum of law, Imig indicated its intent to abandon its remaining claim for breach of contract if the Court ruled as it has.  Specifically, Imig states:

> Because Omi's assets are in Asia, and therefore beyond the jurisdiction of this Court, any judgment against Omi is almost certainly uncollectible. Therefore, once the Court concludes that Omi and Startrade is entitled to recover more damages from [Imig] than [Imig] is entitled to recover *as a matter of law* from Omi, [Imig] intends to abandon its remaining claims, and seek an appropriate end to this action.

Imig Mem. at 1.  Accordingly, upon receipt of this decision, Imig is directed to immediately notify the Court if it still intends to withdraw its breach of contract claim.

Dated:  Central Islip, New York                          SO ORDERED:
              June 16, 2022

                                                          _____/s/_____
                                                          Arlene R. Lindsay
                                                          United States Magistrate Judge